## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **POONE YAGHOUBNEZHAD**, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:23-cv-03094 (TNM) |
| **JULIE STUFFT**, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Several Iranian nationals applied for nonimmigrant visas to pursue graduate or postgraduate education in the United States. Although they have completed the application process and interviewed with a consular officer, they claim their applications have not been fully adjudicated. In October 2023, around 15 months after the first application was completed, the Iranian nationals sued Secretary of State Anthony Blinken and Deputy Assistant Secretary for Visa Services Julie Stufft (collectively, State). They allege that State has "unlawfully withheld or unreasonably delayed" a final determination on their visa applications in violation of the Administrative Procedure Act (APA). State moved to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. That motion is ripe. And the Court will grant it because Plaintiffs fail to state a claim under Rule 12(b)(6).

## I.

Plaintiffs are 16 Iranian nationals who applied for nonimmigrant F or J visas between June and December 2022.[1] Compl. ¶¶ 6–25. All Plaintiffs have received offers of admission to

---

[1] Two Plaintiffs voluntarily dismissed their claims in March 2024 because State issued their visas. *See* Notice of Voluntary Dismissal, ECF No. 12. Another two Plaintiffs voluntarily

graduate programs or academic fellowships or are the spouse or minor child of someone who
has. *Id*. And all have been interviewed by a consular officer and otherwise complied with the
visa application requirements. *Id*. So far, no remaining Plaintiff has received a visa. *Id*. ¶ 73.

The F and J nonimmigrant visas enable their holders to temporarily study or work in the
United States. The F visa admits foreign nationals to participate in educational programs—from
enrollment in a private elementary school to graduate studies. *See* 8 U.S.C. § 1101(a)(15)(F).
The J visa admits aliens to teach, conduct research, or receive training in an approved program.
*Id*. § 1101(a)(15)(J). Under both categories, dependents of a visa applicant also may apply for
admission. *Id*. § 1101(a)(15)(F), (J).

To obtain an F or J visa, an applicant must first gain acceptance to an approved program.
*See* 8 C.F.R. § 214.2(f)(1)(i), (j)(1)(i). Applicants then must file a Nonimmigrant Visa
Application—Form DS-160—through the State Department's online portal. 22 C.F.R.
§ 41.103(a). And last, they must schedule an in-person interview at a U.S. Embassy or
Consulate. 8 U.S.C. § 1202(h)(1). At the interview, a consular officer will determine "the
proper nonimmigrant classification" and the "alien's eligibility to receive a visa." 22 C.F.R.
§ 41.102(a). The visa applicant bears the burden of establishing eligibility. 8 U.S.C. § 1361. If
the consular officer concludes that the information provided is "inadequate to permit a
determination of the alien's eligibility," he may "require the submission of additional necessary
information or question an alien on any relevant matter." 22 C.F.R. § 41.103(b)(2).

---

dismissed their claims in May 2024 for the same reason. *See* Notice of Voluntary Dismissal,
ECF No. 13.

Once an alien has properly completed his visa application and interview, "the consular officer must issue the visa [or] refuse the visa." *Id.* § 41.121(a).[2]  A consular officer will typically make this determination at the interview.  Dep't. of State, 9 Foreign Affairs Manual (FAM) 403.2-7(A) (2023).  Upon refusing a visa, a consular officer must "inform the alien of the ground(s) of ineligibility . . . and whether there is, in law or regulations, a mechanism (such as a waiver) to overcome the refusal."  22 C.F.R. § 41.121(b)(1).  The officer must also "note the reason for the refusal on the application."  *Id.*

Refusals of nonimmigrant visas "must be based on legal grounds, such as . . . INA 221(g)."  22 C.F.R. § 41.121(a).  Under § 221(g), a consular officer must refuse to issue a visa if it appears "from statements in the application, or in the papers submitted therewith" that the alien is ineligible for a visa under any "provision of law" or if the "officer knows or has reason to believe that such alien is ineligible to receive a visa."  8 U.S.C. § 1201(g).  According to the Foreign Affairs Manual, "A refusal under INA 221(g) is, legally, a refusal on a visa application, even if that refusal is eventually overcome."  9 FAM 302.1-8(B).

Because Plaintiffs hail from Iran, they must clear another hurdle.  Iran has been designated a state sponsor of terrorism for decades.  Compl. ¶ 65.  And under 8 U.S.C. § 1735(a), consular officers cannot issue a nonimmigrant visa to "any alien from a country that is a state sponsor of international terrorism unless the Secretary of State determines, in consultation with

---

[2]  In rare circumstances, a consular officer may "pursuant to an outstanding order under INA 243(d), discontinue granting the visa."  *Id.*  This occurs when the Attorney General finds that a foreign government "denies or unreasonably delays" accepting citizens subject to removal from the United States.  8 U.S.C. § 1253(d).  This is not at issue here.

the Attorney General . . . , that such alien does not pose a threat to the safety or national security of the United States."

Plaintiffs all completed Form DS-160 and were interviewed in-person by consular officers.  Compl. ¶¶ 6–25.  Following these interviews, Plaintiffs were all issued "221(g) refusals" and are now in "administrative processing."   Tr. of Mot. Hearing., March 25, 2024 (Mot. Hearing Tr.) at 5.  With their visa decisions allegedly still "pending," Plaintiffs sued State in October 2023.  *See generally* Compl.  They claim that the adjudication of their pending visa applications has been unreasonably delayed in violation of 5 U.S.C. §§ 555(b) and 706(1).  *Id.* ¶¶ 83–110.  They seek, among other things, declaratory and injunctive relief compelling State to "adjudicate Plaintiffs' visas . . . within 90 days."  *Id.* at 21.  State now moves to dismiss their Complaint.

## II.

State argues that dismissal is proper under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  So two standards apply.

To survive a Rule 12(b)(1) motion to dismiss, Plaintiffs "bear[] the burden of establishing jurisdiction by a preponderance of the evidence."  *Bagherian v. Pompeo*, 442 F. Supp. 3d 87, 91 (D.D.C. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  This includes "establishing the elements of standing."  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  At this stage, the Court "assume[s] the truth of all material factual allegations in the complaint and construe[s] the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be

derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (cleaned up).

And to survive a motion to dismiss under Rule 12(b)(6), a complaint must plausibly "state a claim upon which relief can be granted." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 552 (2007).  While "detailed factual allegations" are unnecessary, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  In short, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## III.

This type of visa action is not new.  Several judges in this district have written persuasively on each of State's arguments.  And the Court has considered these opinions in analyzing the specific facts here.  Of course, "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (cleaned up). So the Court will look at each of State's arguments afresh.

State makes four basic arguments.  First, it argues that Plaintiffs lack standing because withholding a visa is not a legally cognizable injury and, even if it were, neither the Secretary nor Deputy Assistant Secretary could provide redress.  Second, it maintains that APA review is unavailable because it has no nondiscretionary duty to take any action on Plaintiffs' visa applications, which have already been refused by consular officers.  Third, and relatedly, State argues that review of its visa decisions is precluded by the doctrine of consular nonreviewability.

5

Last, State argues that even if Plaintiffs' claims are actionable, any delay in processing was not unreasonable.  The Court addresses each of these arguments in turn.

### A.

Consider first whether Plaintiffs have standing to bring this case.  To satisfy Article III's constitutional standing requirements, Plaintiffs must show "(1) an 'injury in fact' that is 'concrete and particularized' as well as 'actual or imminent'; (2) a 'causal connection' between the injury and the challenged conduct; and (3) a likelihood, as opposed to mere speculation, 'that the injury will be redressed by a favorable decision.'"  *Ark Initiative v. Tidwell*, 749 F.3d 1071, 1075 (D.C. Cir. 2014) (quoting *Lujan*, 504 U.S. at 560–61).

### 1.

State argues that the procedural harm of delay and the ultimate harm of impeded travel do not support standing here.

To satisfy Article III, a procedural harm "must be tethered to some concrete interest adversely affected by the procedural deprivation."  *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013).  "[A] procedural right *in vacuo* . . . is insufficient to create Article III standing."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  Since Plaintiffs are non-resident aliens, they have no "constitutional right of entry into this country" the denial of which could constitute a concrete harm.  *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972).  Nor can Plaintiffs assert standing based solely on an "abstract" desire to enter the United States.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (explaining that a "concrete" injury must be

"'real,' and not 'abstract'"). So the alleged delay in processing Plaintiffs' applications—without more—is a purely procedural injury that cannot support standing.

But Plaintiffs plausibly allege that delay in processing their applications has caused cognizable downstream harms. *See Lujan*, 504 U.S. at 572. For one, delay in their visa processing has allegedly affected their concrete "professional and financial interest in earning an advanced degree." Opp'n to MTD (Opp'n) at 13, ECF No. 9. The absence of a final decision has also "caused Plaintiffs anxiety, frustration, and the expenditure of time and precious financial resources." Compl. ¶ 77. As the weight of authority illustrates, these injuries are concrete enough to constitute an injury-in-fact. *See Khan v. Blome*, 2022 WL 17262219, at *3 (D.D.C. Nov. 29, 2022) (finding plaintiff had "concrete financial and other interests in attending his residency program or pursuing other options"); *Rahman v. Blinken*, 2023 WL 196428, at *2 (D.D.C. Jan. 17, 2023) (similar); *Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Kerry*, 168 F. Supp. 3d 268, 282 (D.D.C. 2016) (holding plaintiffs suffered injury in fact when they "fail[ed] to receive final decisions on their [Special Immigrant Visa] applications within a reasonable period").

State does not contest the concreteness of Plaintiffs' injuries. MTD at 14. But it argues that they still lack standing because their injuries are not legally cognizable for two reasons. First, because courts lack authority to review consular visa decisions. And second, because Plaintiffs have no constitutional right of entry to the United States. MTD at 14–19.

Under the doctrine of consular nonreviewability, courts have generally refrained from subjecting consular officials' visa decisions to judicial review. *See Baan Rao Thai Rest. v. Pompeo*, 985 F.3d 1020, 1024 (D.C. Cir. 2021) (cleaned up). But whether consular nonreviewability ultimately applies is "a merits disposition under Federal Rule of Civil

Procedure 12(b)(6)." *Id*. at 1027.  Though consular nonreviewability is "informed by [the Court's] respect for the separation of powers . . . it is not a limit on [its] subject matter jurisdiction as it goes to goes to [the Court's] *willingness*, not [its] *power*, to hear these cases." *Id*. 1029 (cleaned up).  In reviewing standing, "the court must be careful not to decide the questions on the merits for or against the plaintiff." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003).  Because consular nonreviewability presents a merits question, the Court will refrain from addressing it here.

States's argument that Plaintiffs lack standing because they have no right of entry is similarly unavailing.  True, an "unadmitted and nonresident alien" has "no constitutional right of entry" to the United States.  *Kleindienst*, 408 U.S. at 762.  But "harms specified by the Constitution itself" are not the only means for Plaintiffs to establish Article III standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).  Plaintiffs may also plead "traditional tangible harms, such as physical harms and monetary harms" or "[v]arious intangible harms . . . with a close relationship to harms traditionally recognized." *Id*.

Here, Plaintiffs allege that "[t]he absence of an outcome has caused . . . the expenditure of time and precious financial resources."  Compl. ¶ 77.  To apply for their visas, "Plaintiffs paid the requisite visa fees and traveled to an interview at a United States Embassy or Consulate." Such a "monetary harm[ ]" "readily qualif[ies]" as a concrete harm. *TransUnion*, 594 U.S. at 425.  More, Plaintiffs have been forced to "plead[] with their respective schools . . . to hold their sports open until the State Department makes a final decision on their applications." *Id*. ¶ 77. And until their applications are adjudicated, Plaintiffs are denied even the possibility of participating in graduate programs to which they have already been admitted.  As other courts in this district have recognized, Plaintiffs have "concrete professional interests in earning an

advanced degree." *Rahman*, 2023 WL 196428, at *4 (cleaned up).  So the Court concludes that

they have satisfied Article III's injury-in-fact requirement, at least at this early stage in litigation.

*Cf. Pourabdollah v. Blinken*, No. 23-cv-1603, 2024 WL 474523, at *4 (D.D.C. Feb. 7, 2024)

(finding Article III standing based on similar allegations); *Khan*, 2022 WL 17262219, at *3

(same).

## 2.

Next, State contends that, even if the Court were to order the prompt adjudication of

Plaintiffs' visas, it could not remedy their injuries.  MTD at 19.  This is because consular officers

must refuse Plaintiffs' applications absent a determination that they "do[] not pose a threat to the

safety or national security of the United States."  8 U.S.C. § 1735(a).  So even if the Court were

to issue an order expediting the processing of Plaintiffs' applications, Plaintiffs could not obtain

any relief until a § 1735(a) determination is made.

This argument has been rejected by other courts in this district.  *See, e.g.*, *Khazaei v.

Blinken*, No. 23-cv-14192023, WL 6065095, at *4 (D.D.C. Sept. 18, 2023); *Pourabdollah*, 2024

WL 474523, at *4.  And this Court is similarly unpersuaded.  At this stage, it is not Plaintiffs'

burden to plead that the Secretary has made a § 1735(a) determination, which would make way

for their applications to move forward.  This is especially the case considering that standards for

evaluating applications under § 1735(a) are "[u]navailable" to the public.  Compl. ¶ 66.  So long

as Plaintiffs plead—as they have here—that their applications have been refused pending further

review, their injuries plausibly may be redressed with an order to complete that review more

expeditiously.  *See Khazaei*, 2023 WL 6065095, at *4.

**3.**

Next, State argues that neither the Secretary nor Deputy Assistant Secretary for Visa Services are properly named defendants because they lack the authority to adjudicate visas, which lies in the exclusive province of consular officers.  MTD at 30.  The Court agrees as to the Secretary.  But the Deputy Assistant Secretary is a "consular officer" with visa adjudication authority.  So she is properly named.

The Secretary's role in granting and refusing visas is circumscribed by statute.  Under 8 U.S.C. § 1104(a), the Secretary is charged with "the administration and the enforcement of . . . immigration and nationality laws relating to . . . the powers, duties, and functions of diplomatic and consular officers of the United States, *except those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas*."  (emphasis added).  As the D.C. Circuit explained in *Baan Rao*, "the [INA] grants 'consular officers exclusive authority to review applications for visas, precluding even the Secretary of State from controlling their determinations.'"  985 F.3d at 1024 (quoting *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1156 (D.C. Cir. 1999)).

Nonetheless, other courts in this district have concluded that the Secretary still may redress a visa applicant's injury.  They reason that, though the Secretary is barred "from directing a particular outcome with respect to Plaintiffs' visa adjudications," "nothing in *Baan Rao* or *Saavedra Bruno* precludes the Secretary . . . from directing consular officers 'to conclude . . . matter[s] presented to [them]' 'within a reasonable time.'"  *Al-Gharawy v. DHS*, 617 F. Supp. 3d 1, 10 (D.D.C. 2022) (quoting 5 U.S.C. § 555(b)); *see also Lee v. Blinken*, No. 23-cv-1783, 2024 WL 639635, at *3 (D.D.C. Feb. 15, 2024) (holding that the Secretary can "direct[] consular officers to decide pending applications within a reasonable time").

But focusing on *Baan Rao* and *Savendra Bruno*—neither of which addresses the Secretary's authority to supervise visa adjudications—overlooks the plain meaning of § 1104(a). Recall the statutory text.  Though the Secretary has control over "the administration and the enforcement of . . . immigration and nationality laws," he is expressly precluded from "the administration and the enforcement of . . . those powers, duties, and functions conferred upon the consular officers *relating to the granting or refusal of visas*."  8 U.S.C. § 1104(a) (emphasis added).  In other words, the Secretary is precluded not only from "controlling [consular officers'] [visa] determinations," *Baan Rao*, 985 F.3d at 1025, but also from administering or enforcing duties that merely "relate[]" to those determinations, 8 U.S.C. § 1104(a).  This would include administrative guidance for the pace of visa adjudications and the completion of administrative processing.  In the face of this clear textual limitation, the Court will not suppose that the Secretary, as the head of the Department, has some residual authority to control the timing by which consular officers consider applications presented to them.  *But see Al-Gharawy*, 617 F. Supp. 3d at 10.[3]

The Deputy Assistant Secretary presents a different question.  Nothing in § 1104(a) purports to limit the Deputy Assistant Secretary's authority in the administration and enforcement of "duties . . . relating to the granting or refusal of visas."  To the contrary, the Deputy Assistant Secretary has the power to enforce duties relating to visa approvals because she

---

[3]  To be sure, consular officers are inferior officers and therefore must be "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate."  *United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021) (cleaned up).  Though § 1104(a) creates an unusual situation in which the department head does not supervise his subordinates in certain duties, any Appointments Clause problems are likely ameliorated because consular officers are typically supervised and directed by an ambassador, who is also appointed by the President and confirmed by the Senate.  *See* U.S. Const. art. II, § 2, cl. 2.; 22 U.S.C. § 3927.

is a "consular officer," as defined under the INA and its regulations.  *See* 8 U.S.C. § 1101(a)(9)

(defining "consular officer" as "any consular, diplomatic, or other officer or employee of the

United States designated under regulations . . . for the purpose of issuing immigrant or

nonimmigrant visas"); 22 C.F.R. § 40.1(d) ("Consular officer, as defined in INA 101(a)(9)[,]

includes . . . the Deputy Assistant Secretary for Visa Services.").  Thus, the Deputy Assistant

Secretary is not statutorily excluded from administering and enforcing the visa review process.

State nonetheless contends that the Deputy Assistant Secretary cannot redress Plaintiffs'

injuries because she lacks authority over the decisions of individual consular officers.  Mot.

Hearing Tr. 26–27.  That authority lies only with the chief of mission.  *See* 22 U.S.C. § 3927

("[T]he chief of mission to a foreign country . . . shall have full responsibility for the direction,

coordination, and supervision of all Government executive branch employees in that country.").

As a practical matter, the chief of mission may be the official best positioned to address

Plaintiffs' claims.  But since no statute or regulation expressly precludes the Deputy Assistant

Secretary from exercising authority to manage the pace of visa adjudications, the Court

concludes at this initial stage that an order directed to her might redress Plaintiffs' injuries.  So

Plaintiffs have standing to sue at least one of the named Defendants here.  Perhaps further

evidence would justify a different conclusion at the summary judgment stage.  *See California

Cattlemen's Assoc. v. USFWS*, 369 F. Supp. 3d 141, 145 (D.D.C. 2019) (noting plaintiffs'

burden to prove standing grows heavier at each successive stage of litigation).

**B.**

Now consider whether Plaintiffs have a cause of action under § 706(1) of the APA, which authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).   This provision generally applies when an agency fails to take an action required by law.   Yet courts' jurisdiction to compel action under § 706(1) is limited.   A § 706(1) claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take."   *Norton v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55, 63–64 (2004).   In other words, Plaintiffs must show that State is subject to a "legal duty" that is "ministerial or nondiscretionary" and amounts to "a specific, unequivocal command."   *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1241 (D.C. Cir. 2018) (cleaned up).   Because § 706(1) is limited "to *required* agency action," the Court cannot direct "even discrete agency action that is not demanded by law."   *SUWA*, 542 U.S. at 65.

Plaintiffs seek § 706(1) relief on the grounds that State has a discrete and nondiscretionary duty to adjudicate their visa applications within a reasonable time.   *See* Compl. ¶¶ 30–31, 83–110.   This duty arises from the INA and its implementing regulations.   The INA requires that "[a]ll nonimmigrant visa applications shall be reviewed and adjudicated by a consular officer."   8 U.S.C. § 1202(d).   And the INA's implementing regulations dictate that once "a visa application has been properly completed and executed . . . the consular officer must issue the visa, refuse the visa, or . . . discontinue granting the visa."   22 C.F.R. § 41.121(a).   The consular officer must complete this process "properly and promptly . . . in accordance with the applicable regulations and instructions."   *Id*. § 41.106.

Based on these provisions, the Court concludes that State has a discrete, nondiscretionary to adjudicate visa applications.   As other courts in this district have held, "Granting or refusing a

final visa application is a mandatory agency action" under 22 C.F.R. §§ 41.106 and 41.121(a)).

*Vulupala v. Barr*, 438 F. Supp. 3d 93, 100 (D.D.C. 2020); *Khazaei*, 2023 WL 6065095, at *6

(same).   Judicial review under § 706(1) is therefore appropriate if a consular officer has

indefinitely delayed "issu[ing] or refus[ing] [a] visa."  22 C.F.R. § 41.121(a); *see Vulupala*, 438

F. Supp. 3d at 100 ("[A]n alleged failure to [issue or refuse a visa] within a reasonable period of

time is reviewable under the APA.").

But the requirement that State either issue or refuse a visa does not resolve the dispute

here.  This is because, according to State, consular officers already "refused" Plaintiffs' visas

under INA § 221(g), thereby discharging its duty to adjudicate Plaintiffs' applications.  *See* MTD

at 26.  Indeed, even Plaintiffs concede that their applications have been refused under § 221(g).

*See* Mot. Hearing. Tr. at 5.  But they argue that this refusal is not "final" because their

applications remain in "administrative processing."  *See* Opp'n at 17–19.  And only when State

either issues a "final" refusal or grants the visa does it discharge its duty.

To determine whether State has a nondiscretionary duty to complete "administrative

processing" after it has already refused a visa, the Court turns to the text of the INA's

implementing regulations.  The procedure governing nonimmigrant visa refusals is set out in 22

C.F.R. § 41.121.  As described above, this section requires that, "[w]hen a visa application has

been properly completed and executed . . . , [a] consular officer must issue the visa [or] refuse

the visa."  *Id*. § 41.121(a).  And the consular officer must base the refusal "on legal grounds,

such as . . . INA 221(g)."  *Id*.  That provision requires refusal when "the consular officer knows

or has reason to believe that [the applicant] is ineligible to receive a visa . . . under section 1182

of this title, or *any other provision of law*."  8 U.S.C § 1201(g).  When refusing an application, a

consular officer must "inform the alien of the ground(s) of ineligibility . . . and whether there is,

in law or regulations, a mechanism (such as a waiver) to overcome the refusal." 22 C.F.R. § 41.121(b). "The officer shall note the reason for the refusal on the application." *Id*. According to its own internal guidance, State considers "[a] refusal under INA 221(g) [to be] legally, a refusal on a visa application, even if that refusal is eventually overcome." 9 FAM 302.1-8(B).

The INA's implementing regulations also provide guidance for supervisory review of nonimmigrant visa refusals. Section 41.121(b) dictates that "[n]onimmigrant refusals must be reviewed, in accordance with guidance by the Secretary of State, by consular supervisors . . . to ensure compliance with laws and procedures." 22 C.F.R. § 41.121(b). State has described the review required by this provision as a "management and instructional tool" for maintaining "professional standards." *See* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 71 Fed. Reg. 37494-01 (June 30, 2006) (to be codified at 22 C.F.R. pt. 41). And the Secretary has provided additional guidance in the FAM, instructing that "[r]eviewing officers must review as many [nonimmigrant visa] refusals as is practical, but not fewer than 10 percent of refusals for each adjudicating day." 9 FAM 403.12-3. So only a small fraction of all visa refusals receives supervisory review. This review is not automatic.

For most visa refusals, this discretionary review must take place "on the day of the refusal or as soon as it is administratively possible." 22 C.F.R. § 41.121(c). Yet when an applicant's "ground(s) of ineligibility may be overcome by the presentation of additional evidence, and the applicant has indicated the intention to submit such evidence, a review of the refusal may be deferred for not more than 120 days." *Id*.

Plaintiffs contend that this section imposes a nondiscretionary duty to complete administrative processing within 120 days. Mot. Hearing. Tr. 4. But the regulation's text does

not suggest that a consular supervisor must review *all* visa refusals that eventually may be overcome by the presentation of more evidence.  Rather, it states only that, when engaging in supervisory review of such cases, consular officers "may" defer review "for not more than 120 days," when otherwise they would have to complete review "as soon as it is administratively possible."  22 C.F.R. § 41.121(c).  And as with all other visa refusals, review of refusals that may be overcome by additional evidence is conducted "in accordance with guidance by the Secretary of State," and is required only as far as is necessary "to ensure compliance with laws and procedures."  *Id*.  In other words, nothing in § 41.121(c) imposes a duty for State to review any *particular* visa refusal within a certain time.  So § 41.121(c) does not support § 706(1) review.

All told, a careful reading of the INA's regulations regarding nonimmigrant visa refusals reveals that consular officers have a duty to adjudicate completed visa applications and a duty to justify their refusals on "legal grounds, such as . . . INA 221(g)."  22 C.F.R. § 41.121(a).  Conspicuously absent from this provision is any requirement that the refusal be "final" or ineligible for discretionary re-adjudication or "administrative processing."  Last, to the extent that § 41.121(c) imposes an obligation to review some number of visa refusals, this process is subject to the discretion of the Secretary and is mainly a "management and instructional tool."  9 FAM 403.12-4(a).  It does not provide refused applicants with a right to re-adjudication.

In refusing Plaintiffs' applications under § 221(g) after their interviews with consular officers, State complied with the regulations governing visa adjudications.  It thereby discharged its nondiscretionary duty.  Though Plaintiffs allege that their applications remain "pending," they allege no facts suggesting that State's § 221(g) refusal was not a bona fide, lawful refusal.  *See* Mot. Hearing Tr. at 2–3.  They do not argue, for example, that consular officers have declined to

either to issue or refuse their visas or that they refused them without a "legal basis."[4]   Indeed,

Plaintiffs concede that consular officers informed each of them that his or her visa was "refused"

and that the ground of ineligibility was under "INA 221(g)."  *Id*. at 5.  Plaintiffs maintain that

this refusal was not "final" because their applications remain in "administrative processing," and

that, eventually, their visas may be granted.  *Id*.  State admits as much.  *See id*. at 18–19.  But this

is of little relevance since nothing in § 41.121 provides a "specific, unequivocal command" for

State to issue a final, unreviewable decision.  *SUWA*, 542 U.S. at 63.  Nor does any statute or

regulation require State to complete "administrative processing" once it has already properly

refused a visa.  So it is unclear "what 'non-discretionary duty' purportedly imposed by [22

C.F.R. § 41.121(a)] has been 'unlawfully withheld' . . . [when] Plaintiffs themselves indicate that

after their interview, their applications were 'refused' under INA § 221(g)."  *Tesfaye v. Blinken*,

2022 WL 4534863, at *5 (D.D.C. Sept. 28, 2022).

Plaintiffs also claim 5 U.S.C. § 555(b) imposes a duty to issue a final refusal because it

requires agencies to "proceed to *conclude* a matter presented to it" "within a reasonable time."

5 U.S.C. § 555(b) (emphasis added).  But this general directive will not cut it.  While this section

implies that the agency, at some point, must reach a final decision, it "does not speak specifically

to the duties of consular officers, and it uses the open-ended phrase 'within a reasonable time.'"

*Pourabdollah*, 2024 WL 474523, at *6 n.5.  This "is a far cry from the 'discrete agency action'

that courts require when issuing an order compelling agency action 'unlawfully withheld or

unreasonably delayed.'"  *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 9 (D.D.C. 2008).

---

[4]  Plaintiffs argue that State cannot cite INA § 221(g) as a basis for ineligibility.  *See* Mot.
Hearing Tr. 7.  But this ignores 22 C.F.R. § 41.121(a), which states that "INA 221(g)" is an
acceptable "legal ground[]" for refusal.

By arguing that State must complete administrative processing and issue a "final" refusal, Plaintiffs ask the Court to impose a duty that has no basis in the INA or its implementing regulations.  This request clashes with the longstanding assumption that aliens residing abroad are "barred from challenging consular visa decisions in federal court *unless legislation specifically permitted such actions*."  *Saavedra Bruno*, 197 F.3d at 1162 (emphasis added).  So, absent "a specific, unequivocal command" from Congress requiring State to issue "final" refusals or to complete "administrative processing," State has not "unlawfully withheld" any action that the Court has jurisdiction to "compel" under § 706(1).

To be sure, several courts in this district have found § 706(1) jurisdiction even though consular officers had already "refused" plaintiffs' visas under § 221(g).  *See, e.g.*, *Al-Gharawy*, 617 F. Supp. 3d at 16; *Nine Iraqi Allies*, 168 F. Supp. 3d at 296; *Vulupala*, 438 F. Supp. 3d at 99. These decisions rest on the assumption that courts have jurisdiction to review § 221(g) refusals for unreasonable delay because they are not "final."  But, as explained above, this assumption is flawed.  Once a consular officer either issues or refuses a visa, and provides a legal basis for doing so, nothing in the INA or its regulations require consular officers to do anything more.  For the purpose of § 706(1) review, consular officers' § 221(g) refusals are "final."  While State may elect to submit those applications to additional review, it has no duty to take any action beyond the action it already took—refusing Plaintiffs' visas under § 221(g).  Absent such nondiscretionary duty, Plaintiffs have no cause of action under § 706(1).

In any event, these nonbinding cases are also factually distinguishable.  Most notably, in *Nine Iraqi Allies*, the court permitted review under § 706(1) when consular officers "refused" plaintiffs' Special Immigrant Visa applications pending "administrative processing."  168 F. Supp. 3d at 276.  But in that case, "administrative processing" was a "a mandatory step in the

SIV application process." *Id*. at 284.  In finding a cause of action under § 706(1), the court emphasized the "crucial distinction" that, for SIV applicants, "'[a]dministrative processing' is not an opportunity for reconsideration of a decision but is a pre-requisite to reaching the decision itself." *Id*.  Indeed, under the SIV scheme, "if an applicant were somehow to receive a visa in advance of administrative processing, that step would be premature." *Id*. at 286.

In contrast, Plaintiffs here have not shown that the "administrative processing" involved here is "mandatory" or that it is otherwise improper for a consular officer to issue a § 221(g) refusal before its completion.  The text of § 221(g) helps explain why.  Under that provision, consular officers must refuse visas if they "know[] or ha[ve] reason to believe that [an] alien is ineligible to receive a visa . . . under section 1182 of this title, or any other provision of law." 8 U.S.C. § 1201(g).  And the INA's implementing regulations clarify that the term "reason to believe" requires "a determination based upon facts or circumstances . . . that the applicant is ineligible to receive a visa." 22 C.F.R. § 40.6.  In *Nine Iraqi Allies*, the § 221(g) refusal was potentially premature because consular officers could not have reason to believe the applicant was ineligible until mandatory administrative processing was complete.  But here, Plaintiffs do not argue that consular officers lacked a basis for issuing a § 221(g) refusal.  Rather, § 221(g) required consular officers to refuse Plaintiffs applications given that "[n]o nonimmigrant visa . . . shall be issued" to any alien from Iran until the Secretary determines that he or she does not threaten national security.  8 U.S.C. § 1735(a).

But in any case, the Court doubts whether review under § 706(1) was appropriate in *Nine Iraqi Allies*.  Though the agency's internal guidelines suggested that administrative processing was a prerequisite to refusal, these non-binding guidelines generally "cannot impose on an agency an enforceable duty to act."  *See Electronic Priv. Ctr. v. IRS*, 910 F.3d 1232, 1245

(D.C. Cir. 2018). So even assuming Plaintiffs could point to an internal procedure requiring the completion of administrative processing before refusal, courts would not have jurisdiction under § 706(1) to enforce it.

At bottom, although State has a duty to "issue" or "refuse" Plaintiffs' visa applications, no statute nor regulation requires anything more—whether that be a "final" decision or the completion of "administrative processing." Since Plaintiffs concede that State has refused their visas, and they present no legal defect with these refusals, the Court concludes that State has satisfied its duty to adjudicate their applications. Without any statue or regulation pointing to additional discrete action that State is required to take, Plaintiffs cannot compel State to take any further action on their applications under § 706(1).

## C.

State again raises consular nonreviewability as a bar to Plaintiffs' claims. "Th[is] doctrine holds that a consular official's decision to issue or withhold a visa is not subject to judicial review, at least unless Congress says otherwise." *Saavedra Bruno*, 197 F.3d at 1159. Consular nonreviewability derives from "the political nature of visa determinations and of the lack of any statute expressly authorizing judicial review of consular officers' actions." *Id*. Because "[d]ecisions regarding the admission and exclusion of noncitizens 'may implicate relations with foreign powers, or involve classifications [. . .] defined in the light of changing political and economic circumstances,'" courts have consistently held that "such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Baan Rao*, 985 F.3d at 1024 (quoting *Trump v. Hawaii*, 585 U.S. 667, 702 (2018)).

Consular nonreviewability certainly applies to the "substance" of a consular officer's visa determination. *Al-Gharawy*, 617 F. Supp. 3d at 12. And at least one circuit has broadly held that

"the judiciary will not interfere with the visa-issuing process." *Wan Shih Hsieh v. Kiley*, 569 F.2d 1179, 1181 (2d Cir. 1978); *see also Li v. Chertoff*, No. 06-cv-13679, 2007 WL 541974, at *1 (S.D.N.Y. Feb. 16, 2007) (holding that consular nonreviewability precluded "request that a visa be adjudicated (as opposed to granted) within a reasonable period of time"). But several courts in this district have held that the "constitutional and statutory principles" that justify excluding consular officers' substantive decisions from review do not extend to "procedural considerations" such as the pace and timing of visa decisions. *Al-Gharawy*, 617 F. Supp. 3d at 12. On this view, consular nonreviewability "does not bar judicial review of a consular officer's delay when a visa application has been provisionally refused pending a final decision." *Id.* at 11; *see also Vulupala*, 438 F. Supp. 3d at 99 (holding that consular nonreviewability did not apply because § 221(g) refusal was not "final"); *P.K. v. Tillerson*, 302 F. Supp. 3d 1, 11 (D.D.C. 2017) ("[T]he doctrine of consular non-reviewability does not apply where the government has not made a final visa decision.").

Recall that Plaintiffs conceded that consular officers have refused their visas under § 221(g). Mot. Hearing Tr. at 5. They do not contest the validity of these refusals—and even if they did, the Court cannot review a visa refusal based on allegations "that the consular officer did not follow regulations." *Malyutin v. Rice*, 677 F. Supp. 2d 43, 46 (D.D.C. 2009) (cleaned up). Plaintiffs' central argument is that, because their visas remain in "administrative processing," their refusals were not "final." And in requesting only that State issue a "final" decision—no matter what that decision is—Plaintiffs contend that their claim relates only to "procedural considerations" to which consular nonreviewability does not apply. *See* Opp'n at 14.

The Court is not persuaded by this distinction between substance and procedure, at least as it applies here.  It is not as if State took no adjudicatory action, and Plaintiffs are asking the Court to order it to do so.  In this case, State has already taken definitive action, and Plaintiffs want the Court to order it to engage in discretionary re-adjudication of that action more quickly.  But that is, in effect, no different from ordering the State Department to reopen a dispositive adjudication.  Because consular officers have validly refused Plaintiffs' visas, the Court cannot order further review or adjudication of those refusals without requiring consular officers to examine their *substance*.  A substantive change in the outcome of State's visa determination is, after all, the ostensible purpose of requiring State to conclude administrative processing.  Even if such an order does not expressly mandate State to reach a specific outcome on Plaintiffs' visas, it still affects the substance of State's initial refusals by requiring their reexamination.

The Court does not doubt that it can "compel the agency to issue a decision—up or down—on a long-pending application." *Al-Gharawy*, 617 F. Supp. 3d at 13.  But once an agency has issued a decision, the Court must "steer clear of the substance of the decision." *Id*.  In this case, that means refraining from ordering additional processing of an already refused visa application.

## D.

Plaintiffs' claims must be dismissed because the APA does not provide a basis for review and, in any case, review is precluded by consular nonreviewability.  But even assuming State had a discrete, nondiscretionary duty, and that consular nonreviewability did not apply, Plaintiffs have not suffered an unreasonable delay warranting relief.

To evaluate whether an agency's delay is unreasonable, the Court applies the six-factor test from *Telecommunications Research & Action Center* (*TRAC*) *v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984). The *TRAC* factors are:

(1) the time agencies take to make decisions must be governed by a rule of reason;

(2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4) the Court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5) the Court should also take into account the nature and extent of the interests prejudiced by delay; and

(6) the Court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (quoting *TRAC*, 750 F.2d at 80) (cleaned up).

At the outset, the Court notes that Plaintiffs face an uphill climb. The longest delay alleged here was 15 months at the time the Complaint was filed, making the delay now around 22 months. Compl. ¶ 7. Several courts in this district have held that far longer delays in visa adjudications were not unreasonable. *See, e.g.*, *Pourabdollah*, 2024 WL 474523, at *7 (20-month delay not unreasonable); *Dastagir v. Blinken*, 557 F. Supp. 3d 160, 165 (D.D.C. 2021) (29-month delay not unreasonable); *Mirbaha v. Pompeo*, 513 F. Supp. 3d 179, 185–86 (D.D.C. 2021) (27-month delay not unreasonable).

23

## 1.

Courts typically consider *TRAC* factors one and two together.  *Dastagir*, 557 F. Supp. 3d at 165.  The first factor is that the agency's response time is "governed by a rule of reason."  *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008).  The second—whether Congress has provided a timetable—"may supply content for th[e] rule of reason."  *TRAC*, 750 F.2d at 80. At bottom, these factors ask whether there is "any rhyme or reason—congressionally prescribed or otherwise—for an agency's delay?"  *Sawahreh v. Dep't of State*, 630 F. Supp. 3d 155, 161 (D.D.C. 2022) (cleaned up).

These factors strongly favor State.  The parties agree that Congress has not supplied a rule of reason by imposing a statutory deadline on F or J visa processing.  MTD at 38; Opp'n at 22.  But, in general, Congress has given the agencies "an especially wide degree of deference" to decide the admission of foreign nationals, "as they frequently implicate 'relations with foreign powers, or involve classifications defined in the light of changing political and economic circumstances.'"  *Didban v. Pompeo*, 435 F. Supp. 3d 168, 176 (D.D.C. 2020) (quoting *Trump*, 585 U.S. at 702).

Considering this broad grant of discretion, courts have held that "immigration delays in excess of five, six, seven years are unreasonable, while those between three to five years are often not unreasonable."  *Sawahreh*, 630 F. Supp. 3d at 162 (cleaned up).  The longest delay here—22 months—falls well below that threshold.  And in cases with similarly situated Plaintiffs—Iranian nationals applying for F and J visas—other courts in this district have held that delays of 20, 21, and 29 months were not unreasonable.  *Pourabdollah*, 2024 WL 474523, at *7; *Ahmadi v. Scharpf*, No. 23-cv-953, 2024 WL 551542, at *5 (D.D.C. Feb. 12, 2024); *Zandieh*

*v. Pompeo*, No. 20-cv-919, 2020 WL 4346915, at *4 (D.D.C. July 29, 2020).  Plaintiffs make no attempt to distinguish these cases.

Plaintiffs argue that the Court should be selective in its comparators because J and F visas are more time-sensitive than others.  Opp'n at 23–24.  As evidence, they point to a statement from the Virtual Embassy of Iran that describes the processing of student-related visas as a "priority."  Compl. ¶ 70.  But Plaintiffs provide no legal authority for why the Court should apply a stricter rule of reason for more time-sensitive immigrant visas.  Nor would it be appropriate for the Court to meddle with the relative priority of different visa applications.  Those kinds of questions are clearly "within the purview of the wide discretion in immigration processing" provided by Congress.  *Sawahreh*, 630 F. Supp. 3d at 162–63.

## 2.

Now consider for the fourth *TRAC* factor—"the effect of expediting delayed action on agency activities of a higher or competing priority."  *TRAC*, 750 F.2d at 80.  "This factor carries the greatest weight in many cases[.]"  *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 319 (D.D.C. 2020).  Under this factor, the Court may deny relief "where a judicial order putting [Plaintiffs] at the head of the queue would simply move all others back one space and produce no net gain."  *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003). (cleaned up).

Plaintiffs disclaim that an order in their favor would amount to them skipping the line.  *See* Opp'n at 25.  And their prayer for relief asks the Court to order State to adjudicate their applications "according to the priority afforded other similarly situated applicants."  Compl. at 22.  But they also seek a Court order "ensur[ing] they receive a decision within 90 days."  *Id*. Such an order would "necessarily reshuffle[] the queue of other applicants also waiting for

adjudication of their cases." *Dastagir*, 557 F. Supp. 3d at 167.  Even if State were required only to adjudicate Plaintiffs applications "according to the priority afforded other similarly situated applicants," this would still amount to a "judicial reordering[ ] of agency priorities." *Rahman*, 2023 WL 196428, at *4 (cleaned up).  "Relief that would simply reorder a queue of applicants seeking adjudication is generally viewed as inappropriate when no net gain in such adjudications is achieved." *Tate v. Pompeo*, 513 F. Supp. 3d 132, 149 (D.D.C. 2021) (cleaned up).  So this factor weighs in State's favor.

### 3.

Turn next to *TRAC* factors three and five—"the interests prejudiced by delay" including how the delay may affect "human health and welfare." *TRAC*, 750 F.2d at 80.  Plaintiffs allege the delay in processing has forced them to "pass[] up other opportunities" and "defer their admission" to graduate programs.  Compl. ¶ 99.  The Court has no doubt that the visa waiting game can be frustrating.  But Plaintiffs' circumstances are not unique enough to warrant ordering the Secretary to expedite processing at the expense of other applicants who also seek educational and work opportunities. *Accord Palakuru v. Renaud*, 521 F. Supp. 3d 46, 53 (D.D.C. 2021) ("While the Court does not doubt that [plaintiff] has an interest in prompt adjudication, so too do many others facing similar circumstances.").  At most, these factors weigh slightly in support of Plaintiffs.

### 4.

The sixth and final *TRAC* factor simply reminds the Court that it "need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." *TRAC*, 750 F.2d at 79.  Plaintiffs argue that State's "disparate treatment of Iranian national students is indicative of bad faith and impropriety."  Opp'n at 26.  But Plaintiffs broad

allegations about Iranian applicants do not permit the inference that the Secretary has targeted Plaintiffs for unfair treatment.  Though Iranian visa applications may take longer than average, State plausibly contends that any disparate treatment stems from enhanced statutory requirements—such as § 1735(a)'s requirement that State ensures Iranian applicants do not "pose a threat to the safety or national security of the United States"—and not the result of malfeasance.  So the sixth *TRAC* factor is neutral.

*        *        *

Weighing the *TRAC* factors, the Court concludes that Plaintiffs have not stated a claim for unreasonably delay under the APA.

**IV.**

For these reasons, State's Motion to Dismiss will be granted.  While the desire to study and work here is a worthy one, visa-related matters are particularly within the grace of the Executive Branch, and this is not one of the exceedingly rare situations when judicial oversight is allowed.  A separate Order will issue today.

Dated: May 9, 2024                                     _____
                                                       TREVOR N. McFADDEN, U.S.D.J.